**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ABBOTT LABORATORIES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. _____ |
| v. | ) | |
| | ) | |
| POORNIMA SOOD, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendant. | ) | |

## COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Plaintiff Abbott Laboratories ("Abbott"), by and through its undersigned counsel, brings this Complaint for Damages and Injunctive Relief against Defendant Poornima Sood ("Sood") and alleges as follows:

## INTRODUCTION

1.      Abbott brings this action to protect some of its most critical assets in the highly competitive heart failure market — its competitive advantage in the form of its overall 2022 strategic "playbook" for competing in that market, critical non-public information about its clinical trials and FDA submissions, and goodwill with clinicians. As the Senior Director of Clinical and Regulatory Affairs for Abbott's heart failure business, Sood played a critical role in helping Abbott develop that playbook, information, and goodwill.

2.      Last week, Sood informed Abbott that she was resigning to join its competitor Abiomed Inc. ("Abiomed") as a vice president overseeing its clinical and regulatory affairs. Abiomed is one of Abbott's competitors addressed in Abbott's 2022 strategic heart failure "playbook." Sood did not disclose that she had been secretly talking to Abiomed's senior management for nearly two months while working on Abbott's strategic plans.

3.     Sood's planned employment at Abiomed will (1) breach her Abbott Employee Agreement; and (2) misappropriate Abbott's trade secrets because she will inevitably use or disclose them in doing her job.  The resulting harm to Abbott's business will be significant and irreparable.

4.     Abbott seeks temporary, preliminary, and permanent injunctive relief to prevent Sood from (a) working for Abiomed for a period of 12 months, consistent with the terms of her Employee Agreement with Abbott, and (b) disclosing Abbott's trade secrets and other valuable proprietary and confidential information at any time.

5.     This is an action for: (a) breach of contract; (b) violation of the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836 (the "DTSA"); and (c) violation of the Illinois Trade Secrets Act, 765 ILCS 1065/1, *et seq.* (the "ITSA").

## PARTIES

6.     Abbott is an Illinois corporation with its principal place of business in Abbott Park, Illinois.

7.     Defendant Poornima Sood is an individual who was employed by Abbott and, upon information and belief, is a resident and citizen of Massachusetts.

## JURISDICTION AND VENUE

8.     The Court has subject matter jurisdiction over the claim asserting violation of the DTSA under 28 U.S.C. § 1331.  The Court has supplemental jurisdiction over the remaining state law claims under 28 U.S.C. § 1367 because those claims are so closely related to Abbott's federal law claim for misappropriation of trade secrets under the DTSA that they form part of the same case or controversy.

9.     The Court independently has subject matter jurisdiction under 28 U.S.C. § 1332(a) because Abbott (an Illinois citizen) and Sood (a Massachusetts citizen) are citizens of different states, and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

10.     The Court has personal jurisdiction over Sood because, pursuant to her Employment Agreement with Abbott, Sood stipulated and consented to this Court's personal jurisdiction over her and waived the right to object to that jurisdiction for this dispute.  (*See* Employment Agreement, attached as Exhibit 1 ¶ 16(a).)

11.     Venue is proper in this Court because Abbott and Sood "irrevocably agree[d] that all claims" in any action related to Sood's employment with Abbott or her Employee Agreement "shall be heard and determined in . . . the Northern District of Illinois federal courts."  (Ex. 1 ¶ 16(a).)

## FACTS

### Abbott and Abiomed Are Competitors in the Heart Failure Market

12.     Abbott is a global healthcare company that, among other things, develops, markets, distributes, and sells medical devices to improve the health and lives of individuals around the world.

13.     Among its offerings, Abbott is a leader in heart failure management products designed to address the continuum of care, from monitoring for heart failure symptoms to advance stage therapy.  Generally, heart failure occurs when the heart cannot sufficiently pump blood to meet the circulation needs of the body.

14.     Abbott's current portfolio of heart failure products includes: (i) Abbott's CentriMag Acute Circulatory Support System ("CentriMag") and Eurosets's AMG PMP Adult Oxygenator, distributed by Abbott ("AMG PMP"), part of its acute mechanical circulatory support ("Acute

MCS") offerings; and (ii) Abbott's HeartMate 3 Left Ventricular Assist Device ("HeartMate"), part of its chronic mechanical circulatory support ("Chronic MCS") offerings.

15.     CentriMag is an external blood pump designed for short term circulatory support, including for patients in cardiogenic shock. CentriMag addresses a broad spectrum of clinical challenges by supporting a wide range of patient types and sizes, being capable of supporting the left, right, or both ventricles of the heart, and providing excellent hemodynamics.

16.     CentriMag in conjunction with an oxygenator—including the AMG PMP—is used to provide extracorporeal membrane oxygenation ("ECMO"), where CentriMag pumps blood outside of the body into the oxygenator, which adds oxygen to—and removes carbon dioxide from—the blood before it is pumped back into the body. ECMO is used in several situations, including when the patient is recovering from heart surgery.

17.     HeartMate 3 is a potentially lifesaving device for patients suffering from end-stage heart failure, i.e., advanced refractory left ventricular heart failure. HeartMate 3 is a mechanical circulatory support device that helps a patient's heart to pump blood by supporting the weak left ventricle and providing additional blood flow. HeartMate 3 serves several purposes, including as a bridge to transplant ("BTT"), i.e., supporting the damaged heart until a heart transplant is available, and bridge to recovery ("BTR"), i.e., supporting the damaged heart until it heals.

18.     The dynamic heart failure market is competitive and subject to rapid technological advancements and evolving industry standards. Currently, there are multiple companies that are offering or developing medical devices to provide circulatory support and oxygenation, including Abbott and Abiomed.

19.     In its 2021 Annual Report, Abiomed lists Abbott first in nonalphabetical lists of its competitors that are developing medical devices that provide "circulatory support and

oxygenation" or "heart assist" products that "directly and indirectly compete with our products." Abiomed has, in employment contracts, specifically identified Abbott (through its subsidiary St. Jude Medical, Inc.) as one of three competitors that Abiomed employees are prohibited from joining for a period of two years after leaving Abiomed.

20. As one example of competition, Abiomed competes with Abbott in the market for ECMO medical devices. Abiomed offers the Breethe OXY-1 System ("Breethe"), which is a cardiopulmonary support system that pumps, oxygenates, and removes carbon dioxide from blood, and it is marketed and used for extracorporeal circulation. Breethe directly competes with CentriMag in the market for ECMO devices.

21. As another example, Abiomed competes with Abbott in the market for BTT medical devices. Abiomed offers the Impella 5.5, which is a heart pump that delivers mechanical cardiac support, thereby helping a patient's heart to pump blood. Abiomed markets the Impella 5.5 as being "designed for long-duration support." If a physician determines that a patient with shock could be a heart transplant candidate, and determines that the patient might become eligible to receive one within weeks, the physician may implant an Impella 5.5 to support the patient's existing heart with the expectation that transplant might be the ultimate treatment for the patient. In this way, Impella 5.5 competes with HeartMate 3 in the BTT market, as HeartMate 3 otherwise would have been the appropriate bridge to transplant device for that patient.

22. Because of the competitive and dynamic nature of the heart failure market, there is tremendous value to Abbott in obtaining clinical support and regulatory approval for new products, developing and implementing strategies designed to increase Abbott's market share both in the United States and globally, and to avoid losing market share to competitors like Abiomed.

23.     Clinical trials and other scientific investigations of a device's ability to improve patient outcomes are critical to securing clearances from the Food and Drug Administration and otherwise successfully competing in the market for heart failure management products.  As stated in its 2021 Annual Report, Abiomed believes that it competes with Abbott and others primarily on the basis of "clinical superiority," which is the role that Sood will fill.

24.     For example, Abiomed seeks to expand the competition between Abbott's HeartMate 3 and Abiomed's Impella product line beyond BTT.  In particular, Abiomed is launching trials of an Impella product that, like HeartMate 3, can be used for BTR.  The FDA has granted an investigational device exemption for the "Impella BTR."  The first Impella BTR patients have received devices.

## Sood's Employee Agreement With Abbott

25.     In 2017, Abbott acquired St. Jude Medical, Inc. ("St. Jude").  At the time, Sood was a Clinical Program Director for St. Jude.

26.     When Abbott acquired St. Jude, its employees, including Sood, executed employee agreements to continue their employment and secure eligibility for future promotions and raises. In February 2019, Sood executed the current version of her Abbott Employee Agreement (the "Agreement").

27.     In the Agreement, Sood acknowledged that:

> (a)     Abbott has a legitimate business interest in the protections and restrictions set forth in this Agreement and they are reasonable and necessary for the protection of Abbott's Confidential Information (defined below), business goodwill, and the maintenance of a stable and productive workplace for the benefit of Abbott and its employees.

> (b)     in exchange for signing this Agreement, Employee will: (i) learn and have access to Abbott's Confidential Information; (ii) have access to and authority to deal with certain customers and other parties upon whom Abbott depends for its business dealings; and (iii) have

access to training (through on the job experience and otherwise) on Abbott's Confidential Information and other means of success.

(c)     Employee's promises are necessary because Employee's possession of Abbott's Confidential Information, business contacts, training, and similar employment benefits gives Employee an enhanced ability to cause Abbott irreparable harm if Employee engaged in unfair competition.

(d)     Employee is engaged by Abbott in a position of trust and confidence in which Employee will use, observe, obtain or have access to Confidential Information and the other information and benefits described above.

(e)     at the time of signing this Agreement, Abbott's business is in the development, discovery, production, marketing and sale of global health care and medical research products and solutions, and that the market for such products and solutions is fiercely competitive.

28.     She agreed not to disclose Abbott's Confidential Information (the "Non-Disclosure Provision"):

2.     As used in this Agreement, the following terms have the meanings specified:

***

(d)     "Confidential Information" means … marketing, pricing and sales information, customer and prospective customer lists, material sourcing information and lists, business practices, methods and strategies, marketing plans and strategies, buying practices, financial data, operational data, plans and all other know-how, trade secrets, intellectual property and proprietary information;….

***

Employee acknowledges and agrees that items of Confidential Information are Abbott's valuable assets and have economic value, actual or potential, because they are not generally known by the public or others who could use them to their own economic benefit or the competitive disadvantage of Abbott.

***

8.     **Non-Disclosure of Confidential Information.**  Employee acknowledges … Employee shall use all best efforts to protect the secrecy and confidentiality of all Confidential Information, including, as applicable,

such efforts and measures as set forth in Abbott policies, procedures and guidelines. Employee shall not, during the term of employment with Abbott or thereafter, use or disclose, or assist in the disclosure to or use by others, directly or indirectly, any Confidential Information, except as required and authorized in the scope of Employee's job responsibilities and in the furtherance of Abbott's business (to the extent consistent with applicable confidentiality obligations between Abbott and third parties) . . . .

29.     She also agreed not to work for a competitor in a similar role for 12 months following her employment with Abbott (the "Non-Compete Provision"):[1]

2.     As used in this Agreement, the following terms have the meanings specified:

(a)     "Abbott Customer" means, during the last twelve (12) months of Employee's employment with Abbott, any person, corporation or any other commercial organization or entity that Employee called upon, dealt with or had direct contact with: (i) for purposes of selling, promoting, or marketing; (ii) regarding the use of an Abbott service or product on behalf of Abbott; or (iii) that possessed or was provided with Confidential Information.

(b)     "Competing Business" means any person or organization that is engaged in or planning to become engaged in a business that involves a Competing Product.

(c)     "Competing Product" means any product, process, technology, machine, invention or service, either in existence or under development, that has (or will have) the same or similar purpose or use as an existing or developmental product, process, technology, machine, invention or service researched, discovered, developed, manufactured, imported, marketed, sold, offered for sale or used by Abbott.

9.     **Non-Competition.** Employee shall not, during Employee's employment and twelve (12) months after Employee's termination for any reason, in each country in which Abbott conducts business, except as expressly authorized in writing in advance by the Abbott Divisional Vice President & Associate General Counsel, Litigation or his/her designee:

(a)     participate in, manage, supervise, or provide services to a Competing Business: (i) that are the same as or similar in function or purpose to any services Employee provided to Abbott during the last two years of Employee's employment with Abbott; or (ii) that

---

[1] Abiomed's non-compete against Abbott, by contrast, is for two years. *See* ¶ 19.

are otherwise likely to result in the use or disclosure of Confidential Information, notwithstanding Employee's undertaking to the contrary

\*\*\*

(c)    participate in developing or attempting to develop a Competing Product;

(d)    directly or indirectly, promote or market any Competing Products to any Abbott Customer …

30.    With respect to any future employment, the Agreement imposes specific notification obligations on Sood (the "Notification Provision"):

13.    **Notifications to Abbott and New / Potential Employer.** For twenty-four (24) months following the date of Employee's termination from Abbott:

(a)    Employee shall communicate Employee's obligations under this Agreement to each subsequent intended or actual employer, including providing to each such subsequent employer a copy of this Agreement.

(b)    Employee shall notify Abbott of the name and address of Employee's each subsequent intended or actual employer. Abbott shall have the right to advise any subsequent employer of Employee's obligations hereunder.

(c)    If Employee accepts a position with a Competing Business, Employee shall provide Abbott with the information needed or requested for Abbott to conduct a reasonable evaluation of the position as it relates to this Agreement.

(d)    If the scope or applicability of the restrictions in Sections 9 or 10 [providing for non-solicitation] are unclear to Employee, Employee shall first seek clarification of the restriction(s) from the Divisional Vice President, Employee Relations, before taking any action which might reasonably be construed as violation of this Agreement. Employee shall not to sue or take other legal action to challenge the application or enforceability of the restrictions in Sections 9 or 10 without first seeking, in writing to the Abbott Division Vice President & Associate General Counsel, Litigation or his/her designee, to resolve any issue or concern Employee has with those restrictions. This Section 13(d) shall apply during Employee's employment with Abbott and for twenty-four (24) months following the date of Employee's termination from Abbott.

31.     Sood acknowledged that Abbott would face irreparable injury in the event of breach or threatened breach of the foregoing provisions and that Abbott would be entitled to injunctions along with its attorneys' fees:

> 11.     **Breach and Remedies.**  In the event of Employee's breach or threatened breach of any portion of this Agreement, Employee acknowledges and agrees that:
>
> ***
>
> (c)     The restrictive period in Section 9 (Non-Competition), 10 (Non-Solicitation of Employees) and 13 (Notifications to Abbott and New/Potential Employer) shall be extended by the length of time that Employee violates any of those section(s).
>
> (d)     Abbott will face irreparable injury which may not be reasonably possible to calculate in dollar terms, and that in addition to other remedies available, Abbott shall be entitled to injunctions enjoining such breach or threatened breach by Employee, Employee's agents or representatives, or any other persons or entities acting for or with Employee.  Employee further acknowledges and agrees that in addition to any other rights and remedies, Abbott shall be entitled to damages, attorneys' fees and all other costs and expenses reasonably incurred by Abbott in enforcing this Agreement.

### Sood's Senior Role

32.     As Senior Director of Clinical and Regulatory Affairs, Sood is one of the most senior employees in Abbott's heart failure business—her supervisor reported directly to the president of the Heart Failure Division.

33.     As part of her role, Sood was responsible for developing, planning, and executing Abbott's clinical and regulatory strategies relating to its heart failure products.  She knows highly sensitive information about Abbott's clinical and regulatory efforts for its entire heart failure product pipeline, including the strengths and challenges of those products and Abbott's confidential clinical analyses and regulatory plans concerning the products.

-10-

34. As a Senior Director, Sood also had access to, and helped develop, the strategic plans for Abbott's heart failure business. This includes the 2021 Heart Failure Strategy Plan, which details Abbott's strategy for the heart failure business in 2022 and for several years thereafter, including how it plans to compete with Abiomed's products specifically. Sood had access to the 2021 Heart Failure Strategy Plan and was responsible for developing parts of it.

35. In addition, Sood also worked on the strategy plans for Abbott's Acute MCS and Chronic MCS offerings, including the clinical strategy for supporting Abbott's existing and planned products in both areas. Indeed, she was working on these strategy plans for 2022 (to compete in 2023) as late as last month, when she was interviewing with Abiomed. The Agreement's restrictive covenants are designed to prevent a competitor such as Abiomed from acquiring this confidential information by hiring Sood.

36. As part of her role, Sood also was responsible for overseeing Abbott's global heart failure clinical trials, and establishing partnerships with participating medical centers, physicians, key opinion leaders (experts that are widely respected in the medical community), domestic and foreign regulatory agencies, and advisory panels. As the primary point of contact, Sood became the face of Abbott during these clinical trials, and the focus of Abbott's investments in developing the foregoing relationships.

37. A critical factor in Abbott's success is investing in and maintaining its goodwill with the medical centers and physicians participating in clinical trials. Abbott has, through Sood, established and cultivated relationships with those medical centers, physicians, and clinical teams throughout the United States and globally that treat patients with heart failure. Abbott's restrictive covenants are designed, in part, to protect that goodwill, which Abiomed now seeks to profit from by hiring Sood.

-11-

38.     In sum, Sood was intimately involved in the development of highly proprietary and confidential strategic plans — Abbott's proverbial 2022 "playbook" — directed at competing with Abiomed.  She was similarly involved with acquiring critical, confidential information learned in FDA submissions and valuable goodwill with clinicians.  The use of these assets by Abiomed would be devastating for Abbott's business.

### Abbott's Efforts to Maintain Confidentiality

39.     Abbott's 2021 Heart Failure Strategy Plan, and the other strategic plans and information detailed above, are not known to Abiomed and Abbott's other competitors.

40.     To the contrary, Abbott tightly protects the secrecy of these strategic plans and this information from its competitors, which gives Abbott a competitive advantage based on its significant investment in developing successful strategies for expanding its heart failure business.

41.     In the hands of a competitor, this information would allow the competitor to anticipate and effectively undermine Abbott's strategic moves, depriving Abbott of its competitive advantage and unfairly threatening its market share.

42.     Abbott has gone to great lengths to maintain the secrecy of its trade secrets and other confidential information.

43.     Abbott invests millions of dollars each year to protect the confidentiality of its trade secrets and other proprietary information, including implementing appropriate security systems for both its physical offices and electronic databases, including restricted, password-protected SharePoint drives.

44.     Abbott employs robust technology systems designed to protect the integrity of its data, and monitors its systems for signs of infection, intrusion, and dissemination.

45.     Abbott also has an Electronic Media Use Policy that instructs employees to take appropriate precautions against allowing unauthorized access and prohibits sharing unauthorized information with third parties.

46.     Moreover, Abbott protects the confidentiality of its trade secrets and other proprietary information by limiting access to a small number of individuals whose role is critical in the development, analysis, or implementation of the information.

47.     Like it required for Sood, Abbott requires that employees sign agreements acknowledging the existence and importance of Abbott's confidential information and trade secrets, agreeing not to use or disclose such information except as required and authorized within the scope of their employment at Abbott, and stipulating that they will not work for a competitor for a period of time in any role that might involve the use of such information.

**Sood's Resignation to Work for Abiomed**

48.     On March 21, 2022, Sood gave notice to her supervisor that she was resigning from Abbott to join Abiomed.

49.     During her exit interview, Sood said only that her Abiomed title would be "Vice President." Sood was more forthcoming in a prior conversation, where Sood said she had been hired to be Abiomed's Vice President of Clinical and Regulatory Affairs.

50.     Sood disclosed during her exit interview that she will lead Abiomed's clinical and regulatory efforts to support and expand the uses of its heart failure products. That is the precise function Sood filled at Abbott. In addition, Sood disclosed that she will oversee Abiomed's clinical trials, just as she did for Abbott.

51.     Sood will be working for Abiomed — a company that sells competing products — in the same or a very similar function as the one she performed for Abbott as recently as this month, in direct violation of her Non-Compete Provision.

52.     If allowed to join Abiomed before the end of her non-compete period, Sood will be unable to divorce herself from the proprietary and confidential strategies she helped develop while at Abbott.

53.     If Sood works with Abiomed's research and development teams, as she must to lead its clinical and regulatory efforts, she knows the products that Abbott does or does not have in development. If Sood works with Abiomed's marketing and sales teams, as she must to develop the clinical evidence to support Abiomed's products, she knows the messaging Abbott plans to use to compete with those products.

54.     Sood herself stated in internal emails that Abiomed was "nipping" at Abbott's heels. Now she will be able to direct Abiomed on how to overtake Abbott.

55.     Sood will necessarily use her knowledge of Abbott's strategy plans when developing competing clinical and regulatory plans for Abiomed, because she knows where Abbott is devoting its own clinical and regulatory efforts.

56.     For example, if involved in deciding whether Abiomed will pursue a particular regulatory indication for its Impella pump, Sood cannot "forget" Abbott's plans about whether to pursue that indication, its perception of the value of that indication, and its timing and methods for pursuing that indication or not.

57.     Similarly, if Sood is involved in deciding whether to dedicate resources to a particular clinical trial, she will not be able to make that decision in a vacuum, unaffected by her knowledge of whether Abbott has or has not planned for similar trials.

-14-

58.     In the highly competitive and dynamic heart failure market, annual strategic planning is a key driver to maintaining or increasing market share.

59.     For that reason, Abbott undertakes significant effort to maintain the secrecy of annual strategic planning from competitors to prevent competitors from undermining those plans.

60.     Sood's employment with Abiomed will allow Abiomed to gain an unfair competitive advantage to undermine Abbott's efforts through asymmetrical knowledge of Abbott's strategic plans.  For example, armed with knowledge of the regulatory approvals and clinical trials that Abbott deems valuable, Abiomed could focus its resources on those aims as well, or pursue other market segments it knows Abbott will not be pursuing.

61.     Abbott's concerns about misappropriation of its strategic plans is heightened by the fact that before Sood returned her Abbott-issued computing devices, she wiped the contents of her phone and a portable storage device.

62.     Sood's knowledge of and/or benefit from Abbott's strategic plans risks depriving Abbott of market share it otherwise would have achieved.

63.     The amount of such impact cannot be precisely or accurately quantified or measured given the uncertainty of what Abbott would have achieved without Sood's improper disclosure or use of Abbott's strategies.

## COUNT I – BREACH/ANTICIPATORY BREACH OF CONTRACT

64.     Plaintiff repeats and realleges Paragraphs 1 through 64 as though fully set forth herein.

65.     The Agreement is a valid and enforceable contract between Abbott and Sood.

66.     Abbott has fully performed its obligations under the Agreement.

67. Sood has breached or will breach the Non-Compete Provision by accepting a clinical and regulatory position with Abiomed, a "Competing Business" involving a "Competing Product" to Abbott's heart failure products.

68. Sood will be in a position directing Abiomed's clinical and regulatory efforts, and accordingly will provide services to Abiomed that are the same or very similar in function to those she provided to Abbott.

69. Through her clinical and regulatory efforts for Abiomed, Sood will be participating in the development, and indirectly the promotion or marketing, of competing products to Abbott's heart failure products.

70. In addition, Sood's employment with Abiomed is likely to result in her use and disclosure of Abbott's Confidential Information because Sood cannot divorce herself from the confidential strategies that she helped developed for Abbott for 2022 while creating or executing Abiomed's clinical and regulatory strategies in 2022.

71. Sood has breached or will breach the Non-Disclosure Provision because Sood's employment with Abiomed will require her to use and disclose Abbott's Confidential Information.

72. If Sood undertakes employment with Abiomed, as intended, Abbott will be irreparably harmed by Sood's breach of the Agreement because its proprietary and confidential strategic business plans for 2022 will be unfairly undermined and challenged by its direct competitor.

73. Abbott seeks injunctive relief to prevent Sood's threatened breach of the Agreement.

## COUNT II – DEFEND TRADE SECRETS ACT (18 U.S.C. § 1836)

74.     Plaintiff repeats and realleges Paragraphs 1 through 74 as though fully set forth herein.

75.     Abbott has many trade secrets related to its heart failure business, including its 2021 Heart Failure Strategy Plan and the other strategic plans described above.

76.     Abbott derives economic value from these trade secrets because they are not known to Abbott's competitors, allowing Abbott to gain a competitive advantage in the heart failure market through the strategies and information it invests in developing.

77.     Abbott maintains these trade secrets as confidential internally by limiting access to a small number of individuals whose role is critical in the development, analysis, or implementation of the information.

78.     Access to this information is not available to Abbott employees who do not have a business need to access the information, and all individuals accessing the information are subject to employee agreements containing non-disclosure obligations and other restrictive covenants.

79.     In her employment with Abiomed, Sood will inevitably misappropriate Abbott's trade secrets because she will be unable to perform her role in clinical and regulatory affairs without accounting for, and considering, Abbott's trade secret strategies for competing with Abiomed, which she had access to and helped develop.

80.     Sood's misappropriation will cause Abbott irreparable harm by allowing Abiomed to undermine Abbott's competitive advantage in the heart failure market — an advantage that Abbott has gained through its significant investment in the development of trade secret information.

81.     Abbott seeks injunctive relief to prevent Sood's threatened misappropriation of Abbott's trade secrets.

## **COUNT III – ILLINOIS TRADE SECRETS ACT (765 ILCS 1065/1, *et seq*.)**

82.     Plaintiff repeats and realleges Paragraphs 1 through 82 as though fully set forth herein.

83.     Abbott has many trade secrets related to its heart failure business, including its 2021 Heart Failure Strategy Plan and the other strategic plans described above.

84.     Abbott derives economic value from these trade secrets because they are not known to Abbott's competitors, thereby allowing Abbott to gain a competitive advantage in the heart failures market through the strategies and information it invests in developing.

85.     Abbott maintains these trade secrets as confidential internally by limiting access to a small number of individuals whose role is critical in the development, analysis, or implementation of the information.

86.     Access to this information is not available to Abbott employees who do not have a business need to access the information, and all individuals accessing the information are subject to employee agreements containing non-disclosure obligations.

87.     In her employment with Abiomed, Sood will inevitably misappropriate Abbott's trade secrets because she will be unable to perform her role in clinical and regulatory affairs without accounting for, and considering, Abbott's trade secret strategies for competing with Abiomed, which she had access to and helped develop.

88.     Sood's misappropriation will cause Abbott irreparable harm by allowing Abiomed to undermine Abbott's competitive advantage in the heart failure market — an advantage that

Abbott has gained through its significant investment in the development of trade secret information.

89. Abbott seeks injunctive relief to prevent Sood's threatened misappropriation of Abbott's trade secrets.

## PRAYER FOR RELIEF

Abbott respectfully requests that the Court find in its favor and against Defendant Poornima Sood, and grant Abbott the following relief:

A. Issue temporary, preliminary, and permanent injunctive relief prohibiting Sood from employment with Abiomed for a period of 12 months from the date the Order is entered;

B. Issue temporary, preliminary, and permanent injunctive relief prohibiting Sood from using or disclosing Abbott's trade secrets or confidential information;

C. Award Abbott monetary damages to which it is entitled for any misappropriation by Sood of Abbott's trade secrets up until the date she is finally and permanently enjoined from further infringement, including compensatory damages;

D. Award Abbott costs, attorneys' fees, and expenses;

E. Award Abbott pre- and post-judgment interest on its damages; and

F. Award such other and further relief as the Court deems just and equitable.

## JURY DEMAND

Abbott demands trial by jury on all the claims for damages.

Dated: March 31, 2022                       Respectfully submitted,

                                             /s/   *Ronald S. Safer*

                                           Ronald S. Safer
                                           Nick Kahlon
                                           Louis A. Klapp
                                           Sarah E. Finch
                                         RILEY SAFER HOLMES & CANCILA LLP
                                         70 W. Madison Street, Suite 2900
                                         Chicago, Illinois 60602
                                         Phone: 312-471-8700
                                         Fax: 312-471-8701
                                         Email: rsafer@rshc-law.com
                                                  nkahlon@rshc-law.com
                                                  lklapp@rshc-law.com
                                                  sfinch@rshc-law.com

                                         *Attorneys for Plaintiff Abbott Laboratories*